UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ADVANCED MICRO DEVICES, INC., | |
| Plaintiff, | |
| v. | Civil Action No.  13-40007-TSH |
| ROBERT FELDSTEIN, MANOO DESAI, NICOLAS KOCIUK, and RICHARD HAGEN | |
| Defendants. | |

## ADVANCED MICRO DEVICES, INC.'S FIRST AMENDED COMPLAINT

This is an extraordinary case of trade secret transfer/misappropriation and strategic employee solicitation.  Thousands of AMD documents or electronic files have been taken from its facilities by employees leaving to work for its primary competitor in the graphics business, NVIDIA Corporation ("NVIDIA").  Forensically-recovered data shows that it began when former AMD executive, Defendant Feldstein, left AMD in July 2012.  He transferred sensitive AMD documents, and in the next six months the remaining three defendants either did the same thing, violated "no-solicitation of employees" promises, or both – all obvious violations of common law, statute, and/or contracts with AMD.

AMD has uncovered evidence that three of the four defendants—Feldstein, Desai, and Kociuk—transferred to external storage devices trade secret files and confidential information in the days prior to their leaving AMD to work for NVIDIA.  The materials taken by these defendants are confidential, proprietary, and/or trade secret materials relating to developing technology and/or highly confidential business strategy.  Feldstein and Desai admit that they have accessed AMD's confidential, proprietary, and/or trade secret information from their

NVIDIA computers; Desai admits that AMD information was transferred onto her NVIDIA computer.

A separate review of Defendant Desai's and Kociuk's AMD computers revealed that Defendants Hagen and Feldstein both participated in recruiting Desai, who in turn recruited Kociuk and perhaps additional AMD employees to leave AMD for competitor NVIDIA. The continued and ongoing solicitation of AMD employees by Feldstein, Hagen, and Desai is a violation of their agreements with AMD, and if unrestrained, will almost certainly amplify the effect of the wholesale transfer of AMD's information that has occurred and may continue to occur. AMD must take action to stop this conduct.

This case is a perfect example of how the actions of an exiting executive have exploded, affected others, exponentially increased the risk of harm to his former employer, and could unfairly affect the marketplace in a fast-paced, ultra-competitive, and highly-sophisticated technical industry.

## PARTIES

1.      Plaintiff AMD is a Delaware corporation, with its principal place of business in Austin, Texas. AMD also has a facility in Boxborough, Massachusetts, where all four defendants formerly worked.

2.      Defendant Robert Feldstein ("Mr. Feldstein") is an individual who resides at 17 Merriam Road, Grafton, Massachusetts, Worcester County. Mr. Feldstein has been served and is represented by counsel.

3.      Defendant Manoo Desai ("Ms. Desai") is an individual who resides at 2 Elliot Circle, Shrewsbury, Massachusetts, Worcester County. Ms. Desai has been served and is represented by counsel.

4.     Defendant Nicolas Kociuk ("Mr. Kociuk") is an individual who resides at 14 Ellen Street, Worcester, Massachusetts, Worcester County.  Mr. Kociuk has been served and is represented by counsel.

5.     Defendant Richard Hagen ("Mr. Hagen") is an individual who resides at 1 Laurel Avenue, Northborough, Massachusetts, Worcester County.  Mr. Hagen has been served and is represented by counsel.

## JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1331 because AMD is asserting claims under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030. This Court also has subject matter jurisdiction over this matter under 28 U.S.C. § 1332(a) because the amount in controversy exceeds the minimum diversity jurisdictional limits of this Court, exclusive of interest and costs, and is between citizens of different States.

7.     This Court has personal jurisdiction over Defendants because they reside in Massachusetts, transact business in Massachusetts, have made and performed contracts in Massachusetts, and/or have breached duties, violated statutes, and/or committed tortious acts in Massachusetts.

8.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1)-(2) because at least one of the defendants resides in this District and a substantial part of the events or omissions giving rise to the claims occurred in this District.

## FACTS

9.     All four Defendants are former AMD employees who have left the employment of AMD to work for NVIDIA Corporation ("NVIDIA").

10.    NVIDIA is AMD's primary competitor in the video game graphics chip industry. This is big business, and AMD and NVIDIA are the two biggest players in that arena, specifically in the area of graphic processing units (GPUs), system-on-chip products, and platform solutions such as the integration of a GPU and central processing unit (CPU) on the same chip.

11.    NVIDIA's own most recent 10-K report explicitly names AMD as a competitor in GPUs and states that NVIDIA faces competition from AMD in system-on-chip products and expects "substantial competition" from AMD in platform solutions such as integration of a CPU and GPU on the same chip.   *See* NVIDIA 2012 Form 10-K at 9-12, *available at* http://phx.corporate-ir.net/phoenix.zhtml?c=116466&p=irol-reportsannual.

12.    In the relevant market, it is widely-known that NVIDIA and AMD are direct competitors in the area of discrete graphics chips for video games and computers.

13.    AMD and NVIDIA both have operations near Worcester, Massachusetts, and compete for talent and business there and throughout the country.

14.    AMD protects its confidential, proprietary, and trade secret information and takes the process very seriously.

I.    **Defendants Feldstein, Desai, and Kociuk Misappropriate AMD Confidential, Proprietary, and/or Trade Secret Information**

A.    **Feldstein Transfers Key AMD Documents Just Days Before His Departure.**

15.    Defendant Robert "Bob" Feldstein served as Vice President of Strategic Development, an executive-level position, at AMD before his July 13, 2012 departure for NVIDIA.

16.    He was a central executive figure in AMD's Boxborough, Massachusetts operations, knew the employee talent pool in certain groups, and had a mastery of aspects of AMD's strategic efforts.

17.    He was in charge of strategic licensing matters for certain AMD products, including those that compete with NVIDIA products.

18.    By virtue of his employment and responsibilities at AMD, Mr. Feldstein was given access to AMD's confidential, proprietary, and/or trade secret information.

19.    In fact, much of the work Mr. Feldstein did was so highly confidential and secret that even many AMD employees did not have access to the same type of sensitive information to which he had access.

20.    During his tenure at AMD, Mr. Feldstein executed an agreement that, among other things, required him to return AMD data and records upon the termination of his employment, not to divulge confidential information to unauthorized persons, and not to use such information for unauthorized purposes. In Mr. Feldstein's agreement, "Confidential Information" is defined to include any technical, employment, or business matters that are not publicly known.

21.    Mr. Feldstein signed this agreement when AMD acquired Mr. Feldstein's previous employer, ATI Technologies, Inc.; AMD's offer of continued employment, which included a generous package of salary, benefits, stock, and bonuses, was contingent on Mr. Feldstein's execution of the agreement.

22.    On July 13, 2012, Mr. Feldstein left AMD to become the Vice President of Technology Licensing at NVIDIA. His role at NVIDIA involves strategic technology licensing.

23.    Mr. Feldstein knew that he was going to be leaving AMD for NVIDIA at least as early as July 3, 2012.

24.    On July 3, 2012, while on sabbatical from AMD, Mr. Feldstein connected a thumb drive to his AMD computer and copied approximately 8,100 files from the hard drive of his AMD computer onto the thumb drive.

25.    On July 13, his last day at AMD, Mr. Feldstein connected another thumb drive and copied a backup of his Outlook email file onto that thumb drive.

26.    Also on July 13, in addition to copying his Outlook emails, Mr. Feldstein also took the discrete step of transferring a handful of additional confidential AMD files to the thumb drive he previously used on July 3. These files that were transferred on July 13 included two confidential licensing agreements with strategically important customers of AMD and a technology licensing overview document that he created as an AMD executive.  This targeted transfer was distinct from Mr. Feldstein's wholesale transfer ten days earlier.

27.    Mr. Feldstein's hard drive and his Outlook emails contain a wide array of AMD confidential information.

28.    AMD executives, including Mr. Feldstein, frequently communicate via email about confidential, proprietary, and/or trade secret information.  As an upper level executive involved in matters pertaining to AMD's most sensitive and confidential product development and customer relationships, Mr. Feldstein's hard drive from his AMD computer contains confidential, proprietary, and/or trade secret information.

29.    The confidential information in Mr. Feldstein's emails and on the hard drive of his AMD computer would provide an unfair competitive advantage if improperly used or disclosed.

30.    The licensing agreements and technology licensing overview document are labeled and/or identified as Confidential and contain non-public information.

31.    The licensing agreements contain detailed provisions defining the relationship between AMD and two significant customers.  They are highly confidential and kept as secret by AMD.

32.    In the hands of a third party, the licensing agreements would provide a significant competitive advantage.

33.    The technology licensing overview is a strategic document containing non-public information that reflects AMD's approach, or proposed and rejected approaches, to strategic licensing and would similarly provide an unfair competitive advantage if improperly used or disclosed.

**B.    Feldstein Accesses AMD's Information While Working for NVIDIA.**

34.    On July 16, 2012, Mr. Feldstein began working at NVIDIA.  On numerous occasions shortly thereafter, including on July 16, 19, 20, and 23, 2012, Mr. Feldstein accessed some of the AMD documents and/or emails described above on his NVIDIA computer.  This access has been confirmed by independent forensic analysis.

35.    Notably, Mr. Feldstein accessed the technology licensing overview document that he transferred to a thumb drive on July 13, his last day of employment with AMD, and a specific product update document, which, on information and belief, was one of the thousands of files Mr. Feldstein transferred to a thumb drive on July 3.

36.    Forensic analysis of his thumb drive reveals that after Mr. Feldstein began employment at NVIDIA, he accessed a handful of other highly sensitive, AMD trade secret documents.

37.     Mr. Feldstein himself describes the fact that he had these documents as "problematic."

38.     Within four days after Mr. Feldstein accessed these documents, an in-house lawyer for AMD and Mr. Feldstein had a phone call concerning his obligations to AMD.  Mr. Feldstein did not take this opportunity to inform AMD that he retained AMD confidential information or that he had accessed that information from his NVIDIA computer.  He remained silent.

39.     On October 5, 2012, counsel for AMD wrote Mr. Feldstein to remind him of his obligations to AMD.  The letter reminded Mr. Feldstein of his obligations not to use or disclose AMD's confidential information and of his obligation to not retain any of AMD's proprietary materials.  The letter also asked Mr. Feldstein to contact counsel for AMD if he found any such materials in his position.

40.     Mr. Feldstein did not respond to the letter.

41.     Mr. Feldstein did not otherwise let AMD know he retained AMD confidential information or that he had looked at that information while at NVIDIA.

42.     On October 5, 2012, counsel for AMD also wrote NVIDIA to make certain that NVIDIA was aware of Mr. Feldstein's obligations with regard to AMD's confidential, trade secret information.  The letter to NVIDIA asked for specific explanations of how NVIDIA would ensure Mr. Feldstein was not using, relying upon, or disclosing AMD information.  The letter also asked NVIDIA to identify the steps, if any, NVIDIA had taken to ensure that Mr. Feldstein had not brought a physical or electronic copy of AMD's intellectual property to NVIDIA.

43. The General Counsel for NVIDIA, the person to whom Mr. Feldstein directly reports, responded to the letter on October 16, purportedly on both NVIDIA and Mr. Feldstein's behalf.

44. In the letter, the General Counsel asserted that he had personally spoken to Mr. Feldstein about his obligations to AMD. The General Counsel stated that such conversations had occurred upon his arrival, before the October 5 letter, and again after receipt of the letter.

45. In another letter, dated December 17, 2012, the General Counsel again wrote counsel for AMD and again attempted to assure AMD that Mr. Feldstein understood his obligation not to use or disclose any AMD trade secret information.

46. Mr. Feldstein denies that he ever spoke to the General Counsel about his contractual obligations to protect AMD's trade secrets.

47. Mr. Feldstein did not have permission or authorization from AMD to transfer AMD files from his AMD computer to personal thumb drives, to take those files with him after he left AMD, or to look at those files while working for NVIDIA.

48. Mr. Feldstein took, carried away, transferred, and/or copied AMD's trade secrets.

49. Mr. Feldstein's conduct, described above, occurred after he accepted a position with NVIDIA, but before he left AMD.

50. Mr. Feldstein did not return these trade secrets to AMD upon termination of his employment.

51. In addition, Mr. Feldstein concealed his possession of the trade secrets from AMD.

52. Mr. Feldstein accessed trade secrets from AMD on his NVIDIA computer.

53.     On information and belief, and based in part on expert testimony establishing access of key documents by Mr. Feldstein, Mr. Feldstein intended to convert AMD's trade secrets to his own use at NVIDIA, both for his own benefit and the benefit of NVIDIA.

54.     Mr. Feldstein has used AMD's trade secrets, as that term is understood under Massachusetts law.

55.     Mr. Feldstein has testified in this case that he has an exhaustive memory of the matters on which he has worked, highlighting the need for relief in light of the conclusive facts surrounding his transfer of AMD's materials after his departure.

56.     On information and belief, Mr. Feldstein intends to and will use this information for his own benefit and the benefit of NVIDIA.

**C.      Desai Takes A Copy of Her Entire AMD Hard Drive.**

57.     Defendant Manoo Desai worked for AMD as a Senior Manager of ASIC and Layout Design.

58.     NVIDIA offered Ms. Desai a job in November 2012, and her last day with AMD was December 7, 2012.

59.     Prior to this date AMD and NVIDIA had exchanged two rounds of letters wherein AMD expressed concerns about ensuring that non-solicitation and confidentiality agreements of its employees were respected. NVIDIA had responded that it had "taken steps" to ensure compliance with these obligations.

60.     By virtue of her employment and responsibilities at AMD, Ms. Desai was given access to AMD's confidential, proprietary, and/or trade secret information.

61.     Like Mr. Feldstein, Ms. Desai signed an agreement in which she made certain promises for AMD's benefit.  In relevant part, she promised not to disclose confidential

information and not to use confidential information for any non-AMD purpose. She also promised to return all company documents upon termination of her employment.

62.    Ms. Desai's agreement was with ATI Technologies, Inc. and states it is binding "upon my heirs, executors, administrators and other legal representatives for the benefit of ATI, its successors and assigns."

63.    AMD acquired ATI Technologies Inc. in 2006, along with the contract Ms. Desai signed.

64.    After Ms. Desai decided to work for NVIDIA, she and her then coworker Defendant Kociuk engaged in a series of communications about how Desai could copy and/or eliminate documents, data, or information from her computer.

65.    On December 6, 2012, the day before Ms. Desai's last day at AMD, Mr. Kociuk sent Ms. Desai a link to a program entitled "Sdelete," designed to enable deletion of certain electronic data.

66.    On the same day, an external storage device was attached to Ms. Desai's AMD computer.

67.    The entire contents of her AMD hard drive, including a folder called "Perforce," were transferred to the external storage device.

68.    Perforce is AMD's internal database that stores the technological work and development of AMD process and product. Employees populate the Perforce site as they conclude phases of technical development, and it contains a vast amount of AMD confidential information.

69.    Ms. Desai's "Perforce" folder contained numerous files, many of which bear confidentiality designations on their face. Documents in the folder contain highly confidential

technical information relating to the latest generation of product and process being developed by AMD. This confidential information would not be disclosed outside of AMD, and would provide a competitive advantage if disclosed to others in the industry.

70.     On December 7, 2012, Ms. Desai's last day at AMD, someone using Ms. Desai's user account accessed at least two Outlook email files on the external device.

71.     There is also evidence that, also on December 7, someone attempted, unsuccessfully, to run the deletion program Mr. Kociuk sent on December 6.

72.     Ms. Desai claims not to know who attempted to run the deletion program, but leaves open the possibility that Mr. Kociuk did it, given that she provided him access to her AMD computer.

73.     Ms. Desai claims that her husband is the individual who attached the external storage device to her computer on the evening of December 6. Ms. Desai admits that he did so at her direction.

**D.     Confidential Documents Were Transferred To Ms. Desai's NVIDIA Computer.**

74.     Ms. Desai has admitted under oath in this case that confidential AMD documents were transferred to her NVIDIA computer.

75.     Ms. Desai has admitted under oath in this case that she has looked at the AMD documents on her NVIDIA computer at least once.

76.     Ms. Desai did not alert AMD that she retained AMD confidential information, that such information had been transferred to her NVIDIA computer, or that she had looked at AMD information while at NVIDIA.

77.     Ms. Desai did not have permission or authorization from AMD to transfer AMD files from her AMD computer to a personal hard drive, to take those files with her when she left

AMD, to transfer any of those AMD files to her NVIDIA computer, or to look at those files while working for NVIDIA.

78.    Nor did she have AMD's permission or authorization to ask or allow her husband to engage in the conduct described above.

79.    Ms. Desai's husband did not have permission or authorization from AMD to engage in the conduct described above.

80.    Ms. Desai took, carried away, transferred, and/or copied AMD's trade secrets.

81.    Ms. Desai's conduct, described above, occurred after she accepted a position with NVIDIA, but before she left AMD.

82.    Ms. Desai did not return these trade secrets to AMD upon termination of her employment.

83.    In addition, she concealed her possession of the trade secrets from AMD.

84.    On information and belief, Ms. Desai intended to convert AMD's trade secrets to her own use at NVIDIA, both for her own benefit and for the benefit of NVIDIA.

85.    Accordingly, Ms. Desai has used AMD's trade secrets, as that term is understood under Massachusetts law.

86.    Amplifying the need for relief, when coupled with the undisputed conduct on the part of Ms. Desai or those acting on her behalf, it is clear that Ms. Desai retains knowledge of AMD's confidential, proprietary, and trade secret materials.

87.    On information and belief, Ms. Desai intends to and will use this information for her own benefit and the benefit of NVIDIA.

E.        **Defendant Kociuk Takes Copies of Entire AMD Hard Drives.**

88.        Defendant Kociuk was a Senior Member Technical Staff ("SMTS") ASIC/Layout Design Engineer at AMD.  He submitted his resignation from AMD on January 2, 2013, and he now works for NVIDIA.

89.        At AMD, Mr. Kociuk worked directly for Ms. Desai.

90.        By virtue of his employment and responsibilities at AMD, Mr. Kociuk was given access to AMD's confidential, proprietary, and/or trade secret information.

91.        Like Ms. Desai, Mr. Kociuk signed an agreement with AMD's predecessor company in which he promised not to use or disclose confidential company information or materials, and to return all company materials upon departure.

92.        In the three days leading to Ms. Desai's December 7, 2012, departure from AMD, and in addition to sending her the "Sdelete" program, Mr. Kociuk ran on his AMD computer multiple internet searches, including those for "*dump ntfs filesystem for use on other computer,*" "*Robocopy,*" and "*delete mail from BlackBerry and server.*"  "NTFS" is the file system used by modern Windows operating systems to store files on a hard drive, and "Robocopy" is a file copy utility that allows someone to copy a large number of files at one time.

93.        The week following Ms. Desai's departure, Mr. Kociuk again ran multiple internet searches, including those for "*clone ntfs drive,*" and "*robocopy*" (again).   He also conducted internet searches for how to securely erase a hard drive and accessed websites related to data destruction, including one called "How to REALLY erase a hard drive."

94.        On information and belief, the purpose of these searches, in light of Mr. Kociuk's subsequent conduct, was to wholesale copy thousands of AMD files without being caught.

95.        On December 14, 2012, Mr. Kociuk used the Robocopy utility to copy more than 150,000 files from Mr. Kociuk's AMD computers to a 2 terabyte hard drive.

96.     Mr. Kociuk admits that he copied the entire contents of AMD computers to the hard drive.

97.     Additionally, in 2008 or 2009 Mr. Kociuk took out the AMD-issued hard drive in one of his AMD computers and replaced it with a different hard drive.  Before he left AMD, Mr. Kociuk placed the AMD-issued hard drive back into the computer and took the hard drive he had been using.

98.     Given his work responsibilities as a Senior Member of Technical Staff at AMD, Mr. Kociuk's computer contained AMD confidential information that is properly protected, not known outside of AMD, and if disclosed to the industry would provide an unfair competitive advantage.

99.     Mr. Kociuk's last day with AMD was January 11, 2013.  Prior to his exit interview that day, Mr. Kociuk was asked to complete a form specifically identifying and disclosing any storage device in his possession with AMD information on it.

100.    On the form, Mr. Kociuk did not mention the 2 terabyte storage device or the hard drive he had used in but taken out of his AMD computer.  Instead, he represented that he had returned all AMD property, and he specifically represented that he had no personal devices containing AMD electronic data.

101.    Mr. Kociuk did not have permission or authorization from AMD to transfer AMD files from his AMD computer to the 2 terabyte storage device, to take the files on that device with him when he left AMD, or to retain the files on the hard drive he used in his AMD computer beginning in 2008 or 2009.

102.    Mr. Kociuk took, carried away, transferred, and/or copied AMD's trade secrets.

103.    Mr. Kociuk's conduct, described above, occurred after he accepted a position with NVIDIA, but before he left AMD.

104.    Mr. Kociuk did not return these trade secrets to AMD upon termination of his employment.

105.    In addition, he concealed his possession of the trade secrets from AMD.

106.    On information and belief, Mr. Kociuk intended to convert AMD's trade secrets to his own use at NVIDIA, both for his own benefit and the benefit of NVIDIA.

107.    Mr. Kociuk has used AMD's trade secrets, as that term is understood under Massachusetts law.

108.    Amplifying the need for relief, when coupled with his undisputed conduct, it is clear that Mr. Kociuk retains knowledge of AMD's confidential, proprietary, and trade secret materials.

109.    On information and belief, Mr. Kociuk intends to and will use this information for his own benefit and the benefit of NVIDIA.

**F.    AMD Has Been Harmed by Defendants Feldstein, Desai, and Kociuk's Misappropriation of AMD's Trade Secrets**

110.    The confidential AMD information Defendants Feldstein, Desai, and Kociuk took when they left AMD would provide a significant competitive advantage to NVIDIA if Defendants were to rely on it in any way.

111.    Feldstein and Desai have both admitted under oath in this case to accessing AMD's information while working for NVIDIA on their NVIDIA computers.

112.    Feldstein, Desai, and Kociuk have all used AMD's trade secret information, as that term is understood under Massachusetts law.  In addition, on information and belief,

16

Feldstein, Desai, and Kociuk all took AMD's trade secret information with the intent of using it at NVIDIA.

113.    Defendants Feldstein, Desai, and Kociuk's misappropriation and unlawful retention of AMD's trade secrets have caused AMD substantial direct and consequential damages.  Even at this initial stage, AMD has already been forced to retain the services of forensic experts to determine what AMD trade secrets were taken by Defendants, when, and what Defendants later did with those trade secrets.  AMD has also had to retain attorneys to enforce Defendants' contractual, statutory, and common-law obligations.  Discovery is in its infancy, and AMD cannot be certain at this time what other harm may already have occurred as a result of Defendants' unlawful conduct.

114.    Furthermore, Defendants Feldstein, Desai, and Kociuk's misappropriation and unlawful retention of AMD's trade secrets have caused AMD to continue to suffer irreparable harm that cannot be adequately redressed at law.  Unless injunctive relief is granted, AMD will be irreparably harmed in a manner not fully compensable by money damages.

## II.    **Defendants Feldstein, Hagen, and Desai Violate Their Non-Solicitation Agreements.**

115.    Defendants Feldstein and Desai's wrongful conduct is not limited to their transfer/misappropriation of AMD confidential information. As set forth in detail below, they— along with Defendant Richard Hagen—also violated the non-solicitation promises in their employee agreements with AMD.

### A.    **Defendants Hagen and Feldstein Recruit Defendant Desai, Despite Contractual Obligations to the Contrary.**

116.    Defendant Richard Hagen was a former executive at AMD's Boxborough operation.

117.    Prior to his departure from AMD, he served as Chief Engineer, Senior Director of Silicon Engineering at AMD.

118.    By virtue of his employment and responsibilities at AMD, Mr. Hagen was given access to AMD's confidential, proprietary, and/or trade secret information.

119.    On October 18, 2012, Mr. Hagen left AMD to become the Senior Director of Engineering at NVIDIA.

120.    Prior to his departure he was subject to an AMD legal debriefing, and was provided a copy of his agreement with AMD (discussed further in the next paragraph) so that he could fully comprehend the specific obligations he had to AMD.

121.    Before Mr. Hagen began to work for AMD, he executed an agreement in which he promised not to solicit AMD employees to work for another employer.  Specifically, Mr. Hagen promised, among other things, not to "solicit any of [AMD's] employees, or assist others to solicit such employees, to leave his or her employment with [AMD]."[1]   The restrictions on Mr. Hagen's ability to solicit current AMD employees applied during his employment with AMD and for only 24 months thereafter (or until October 2014) after the termination of his employment with AMD.

122.    Mr. Hagen's agreement, like Ms. Desai's and Mr. Kociuk's, was signed with ATI Technologies Inc. and/or its subsidiaries.  Like those agreements, Mr. Hagen's agreement with ATI specifically provided that it was for the benefit of ATI, and its successors and assigns, such as AMD.

123.    Mr. Hagen was a mentor to Ms. Desai.

_____

[1] Mr. Hagen's agreement also included promises to protect AMD's confidential information and return company documents.  AMD is not asserting a misappropriation of trade secrets claim against Mr. Hagen at this time.

124.    Following Mr. Hagen's acceptance of his position at NVIDIA, AMD's counsel expressed via letter dated October 5, 2012 to NVIDIA that it had concerns regarding solicitation and confidentiality related to several employees, including Mr. Hagen.    NVIDIA responded stating that NVIDIA had taken "deliberate steps" to avoid any violation of obligations to AMD.

125.    After Mr. Hagen resigned from AMD to begin working for NVIDIA, an NVIDIA recruiter contacted Ms. Desai.

126.    At the same time the NVIDIA recruiter contacted Ms. Desai, he also contacted Defendant Kociuk and another individual who worked on Ms. Desai's nine-person team, Stephen Mburu.

127.    The names of people on Ms. Desai's team, and the organizational structure of that team, were not public knowledge.

128.    A few days later, on October 24, 2012, Ms. Desai e-mailed Mr. Hagen.    In this series of emails, Defendant Hagen identified NVIDIA's plans to open a new operation between Marlborough and Boxborough, Massachusetts.

129.    Ms. Desai then conveyed the information to Defendant Kociuk, who complained that it would add commute time (presumably if he were to work for NVIDIA).    Ms. Desai responded that Mr. Hagen "will push to have an office closer to grab talent."

130.    Sometime after Mr. Hagen and Ms. Desai's email exchange on October 24, Mr. Hagen and Ms. Desai decided to meet.    They had lunch together on Wednesday, November 7, 2012.  The lunch began at noon, and at 1:23 p.m. Ms. Desai e-mailed Mr. Hagen her resume.

131.    In his agreement with AMD, in addition to promising to protect AMD's confidential information, Defendant Feldstein also promised not to "hire or attempt to hire an employee of [AMD], or directly or indirectly solicit, induce or encourage an employee of [AMD]

to leave his or her employ to work for another employer . . . ." Mr. Feldstein acknowledged that such a promise was necessary because "information relating to the identities, preferences, salaries, and circumstances of employees of [AMD] are trade secrets belonging to [AMD] that would likely be used by me if I were to solicit employees from the Company."

132.    On November 12, 2012, Ms. Desai traveled to Santa Clara, California to interview with NVIDIA.

133.    Mr. Feldstein works primarily out of NVIDIA's Santa Clara, California offices.

134.    Mr. Feldstein and Ms. Desai met at NVIDIA's facility the morning of Ms. Desai's NVIDIA interviews.

135.    In e-mails to Stephen Mburu, the other colleague at AMD who was contacted by the NVIDIA recruiter at the same time as Ms. Desai and Mr. Kociuk, Ms. Desai wrote that she had run into somebody she knew and "[h]ad to make up a story for my trip.  Hope I don't run into AMD people."

136.    In e-mails to her husband that day, Ms. Desai wrote, "Just finished talking to Bob. Went really well.  Let's hope it continues."

137.    Mr. Feldstein is known as "Bob" among those with whom he worked at AMD.

138.    During their meeting, Mr. Feldstein told Ms. Desai that he thought she should have a director-level position.  Ms. Desai did not have a director-level position at AMD.

139.    Within hours of her interview at NVIDIA, Mr. Hagen called Ms. Desai.  He made "everything seem urgent" and asked her "how quickly [she] could give notice."

140.    On November 14, 2012, a week after her lunch with Mr. Hagen and two days after her meeting with Mr. Feldstein, Ms. Desai wrote the NVIDIA recruiter to let him know her "application is now in the system."

141.    Emails reflect that NVIDIA gave Ms. Desai a formal offer of employment on November 16, 2012.

142.    After AMD learned of NVIDIA's offer to Ms. Desai, AMD offered Ms. Desai a promotion.

143.    Ms. Desai discussed both the job offer from NVIDIA and the promotion offer from AMD with Mr. Hagen.

144.    On information and belief, Mr. Hagen encouraged Ms. Desai to leave AMD and work for NVIDIA.

145.    On information and belief, Mr. Feldstein encouraged Ms. Desai to leave AMD and come to NVIDIA.

**B.    Defendant Desai Improperly Solicits Other AMD Employees to Leave and Join NVIDIA.**

146.    Ms. Desai has similar contractual obligations to refrain from soliciting AMD employees, as she promised that, during her employment and for two years after, she would not "directly or indirectly solicit or take away . . . employees . . . for [her] own benefit or for the benefit of any other party."

147.    In violation of those contractual obligations, Ms. Desai has also solicited AMD employees to work at NVIDIA.

148.    On November 15, 2012, she received an e-mail from Defendant Kociuk—stating that his "resume is off, and sent Rick [Hagen] a note."

149.    Mr. Kociuk talked to Mr. Hagen about working for NVIDIA, and Mr. Hagen gave him a "spiel" about how much he likes working for NVIDIA.

150.    When Kociuk told Desai he was inclined to investigate leads in addition to NVIDIA, Desai wrote back, "I want you to come with me."  She also told Mr. Kociuk that she had shared this information with "Rick, . . . telling him time is short."

151.    On information and belief, Ms. Desai encouraged Mr. Kociuk to leave AMD and come to NVIDIA.

**C.     On Information and Belief, Defendants' Unlawful Solicitation Is Not Limited to the Individuals Identified Within the Complaint.**

152.    Since Mr. Feldstein left AMD for NVIDIA in July, more Boxborough employees have resigned to work for NVIDIA.

153.    In the days and weeks following Ms. Desai's departure, ten more AMD employees submitted their resignation.

154.    Upon information and belief, each of these individuals was solicited and encouraged to join NVIDIA by Mr. Feldstein and/or Mr. Hagen, or Ms. Desai (who was herself solicited and encouraged by Mr. Feldstein and Mr. Hagen), or by people who, on information and belief, have worked at the direction or encouragement of Defendants, and/or in direct violation of their contracts with AMD.

155.    While AMD has recently reduced portions of its workforce due to a restructuring to lower its expense base and reduce organizational complexity, key talent and skill sets remain important to its business.  One example of these is the gaming console business, the area where each of the Defendants worked.

**D.     AMD Has Been Harmed by Defendants' Solicitation.**

156.    In their roles at AMD, both Feldstein and Hagen had confidential, non-public information—particularly in regard to certain key Boxborough Design Center employees—about employee salaries, bonus, and compensation plans; certain employee ratings and rankings;

certain employees' areas of technological strengths and emphasis; the identity of employees with strategic knowledge about certain AMD products; certain employees' personal circumstances; and the identity of certain employees who may be critical to design or research and development efforts in the areas in which NVIDIA competes with AMD.

157.    Ms. Desai had similar confidential and non-public information, particularly about employees in the ASIC/Layout Design group in Boxborough.

158.    Defendants' violations of their non-solicitation provisions have already caused AMD harm.  Losing valued employees and replacing them with new employees has costs both in terms of time, e.g. lost productivity, and money.  Encouraging employees to leave, particularly in large numbers, also impacts AMD's good will.   In addition, AMD has also had to retain attorneys to enforce Defendants' contractual obligations.

159.    AMD has documentary and/or forensic evidence of Mr. Feldstein's and Mr. Hagen's conduct in regard to solicitation, recruitment, and/or interview of Ms. Desai, and of Ms. Desai's solicitation of Kociuk and others.  If Defendants have behaved—or continue to behave— unlawfully beyond this, however, the harm to AMD will be even greater than it currently realizes.  This loss of engineering and employee talent, if sustained, will result in harm to AMD, some of which will be intangible, and difficult to quantify.

## CAUSES OF ACTION

### COUNT I: Misappropriation of Trade Secrets, Massachusetts Common Law
### (Feldstein, Desai, Kociuk)

160.    AMD realleges and incorporates by reference the foregoing paragraphs.

161.    By virtue of their employment and responsibilities, Defendants Feldstein, Desai and Kociuk were given access to trade secrets and other confidential and proprietary

information—information that is used in AMD's business and gives it an opportunity to obtain an advantage over competitors who do not know or use it.

162.    AMD takes reasonable steps to preserve the secrecy of its confidential and proprietary information and trade secrets.  AMD derives independent economic value from the fact that the information is not generally known to the public or to AMD's competitors.

163.    Defendants Feldstein, Desai, and Kociuk had and have a continuing duty to maintain confidentiality of trade secrets and other confidential and proprietary information, as well as a continuing duty not to use, exploit, or divulge such information other than in connection with the performance of their duties for AMD, for the benefit of AMD and with AMD's authorization.

164.    As required by Massachusetts law, AMD states as follows:  The conduct described herein establishes that Defendants Feldstein, Desai, and Kociuk misappropriated, disclosed, misused, took, carried away, transferred, copied, concealed, exploited, and/or otherwise used AMD's trade secrets and/or confidential and proprietary information to benefit themselves and/or NVIDIA, to the detriment of AMD.

165.    Additionally and alternatively, on information and belief Defendants Feldstein, Desai, and Kociuk wrongfully took AMD's trade secrets and intended to convert those trade secrets to their own use at NVIDIA, both for their own benefit and the benefit of NVIDIA.

166.    As a direct and proximate result of Defendants Feldstein, Desai, and Kociuk's wrongful conduct, AMD has suffered and will continue to suffer substantial direct and consequential damages.

167.    As a direct and proximate result of Defendants Feldstein, Desai, and Kociuk's wrongful conduct, AMD has suffered and will continue to suffer irreparable harm that cannot be

adequately redressed at law.  Unless injunctive relief is granted, AMD will be irreparably harmed in a manner not fully compensable by money damages.

### COUNT II: Misappropriation of Trade Secrets, Massachusetts General Law Ch. 93, § 42, and § 42A
### (Feldstein, Desai, Kociuk)

168.    AMD realleges and incorporates by reference the foregoing paragraphs.

169.    AMD has information, tangible or intangible or electronically kept or stored, that constitutes, represents, evidences or records a secret scientific, technical, merchandising, production or management information, design, process, procedure, formula, invention or improvement.

170.    This information is used in AMD's business and gives it an opportunity to obtain an advantage over competitors who do not know or use it.

171.    AMD took reasonable steps to preserve the secrecy of that information.

172.    Defendants Feldstein, Desai, and Kociuk stole, unlawfully took, carried away, concealed, copied, or otherwise used this information from AMD, with the intent to convert that information to their own use.  This conduct was willful, knowing, and/or in bad faith.

173.    Defendants Feldstein, Desai, and Kociuk's conduct violates the Massachusetts Trade Secrets Act, Massachusetts General Laws chapter 93, § 42, and § 42A.

174.    As a direct and proximate result of Defendants Feldstein, Desai, and Kociuk's conduct, AMD has suffered and will continue substantial direct and consequential damages.

175.    As a direct and proximate result of Defendants Feldstein, Desai, and Kociuk's wrongful conduct, AMD has suffered and will continue to suffer irreparable harm that cannot be adequately redressed at law.  Unless injunctive relief is granted, AMD will be irreparably harmed in a manner not fully compensable by money damages.

### COUNT III: Unfair Competition, Massachusetts General Law Ch. 93A, §11
### (Feldstein, Desai, Kociuk)

176.    AMD realleges and incorporates by reference the foregoing paragraphs.

177.    AMD engages in the conduct of trade or commerce.

178.    Defendants also engage in trade or commerce. They provided services to AMD in exchange for financial benefits. They now provide services to NVIDIA in exchange for financial benefits.

179.    Through their misappropriation of AMD's confidential, proprietary, and/or trade secret information, Defendants Feldstein, Desai, and Kociuk have used or employed an unfair method of competition and/or an unfair or deceptive act or practice.

180.    As a direct and proximate result of Defendants Feldstein, Desai, and Kociuk's wrongful conduct, AMD has suffered and will continue substantial direct and consequential damages, including a loss of money and/or property.

181.    Defendants' misappropriation of AMD's trade secrets affects and harms the open marketplace.

182.    As a direct and proximate result of Defendants Feldstein, Desai, and Kociuk's wrongful conduct, AMD has suffered and will continue to suffer irreparable harm that cannot be adequately redressed at law. Unless injunctive relief is granted, AMD will be irreparably harmed in a manner not fully compensable by money damages.

### COUNT IV: Violations of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030
### (Feldstein, Desai, Kociuk)

183.    AMD realleges and incorporates by reference the foregoing paragraphs.

184.    AMD's computers and computer systems are protected computers that are used in or affect interstate and foreign commerce or communication.

185.    Defendants Feldstein, Desai, and Kociuk intentionally accessed AMD's protected computers, without authorization and/or in a way that exceeded their authorized access, and thereby obtained information from AMD's protected computers.

186.    Defendants Feldstein, Desai, and Kociuk's access was without authorization and/or exceeded their authorized access because (i) it violated their employee agreements and/or their employee duties of loyalty, (ii) it was not for AMD's benefit but was for their own benefit or the benefit of others, and/or (iii) they developed an interest adverse to AMD's before they accessed, copied, and/or transmitted the information they obtained.

187.    Defendants Feldstein, Desai, and Kociuk engaged in their conduct knowingly and with the intent to defraud, using dishonest methods to obtain AMD's secret information.

188.    Defendants Feldstein, Desai, and Kociuk caused loss and/or damage to AMD aggregating at least $5,000 in value during any 1-year period, including, among other things, the diagnostic measures AMD took after it learned of the defendants' unlawful access and copying and/or transmitting of information, including but not limited to the costs of engaging a computer forensics firm.

189.    Consequently, Defendants Feldstein, Desai, and Kociuk have violated the Computer Fraud and Abuse Act, codified at 18 U.S.C. § 1030.

190.    As a direct and proximate cause of Defendants Feldstein, Desai, and Kociuk's violations of the Computer Fraud and Abuse Act, AMD has suffered and will continue to suffer substantial direct and consequential damages.

191.    As a direct and proximate cause of Defendants Feldstein, Desai, and Kociuk's violations of the Computer Fraud and Abuse Act, AMD has suffered and will continue to suffer

irreparable harm that cannot be adequately redressed at law.  Unless injunctive relief is granted, AMD will be irreparably harmed in a manner not fully compensable by money damages.

### COUNT V: Breach of Employee's Duty of Loyalty, Massachusetts Common Law
### (Feldstein, Desai, Kociuk)

192.    AMD realleges and incorporates by reference the foregoing paragraphs.

193.    By virtue of their employment at and responsibilities for AMD, Defendants Feldstein, Desai, Kociuk, and Hagen had access to AMD's confidential, proprietary, and/or trade secret information.  All four defendants occupied positions of trust and confidence.

194.    In addition, Defendants Feldstein and Hagen occupied executive-level and/or director positions at AMD.

195.    Defendants, therefore, owed AMD the duty of loyalty.

196.    Defendants Feldstein, Desai, and Kociuk promoted their own interests in a manner injurious to AMD.  While they were still employed at AMD, Defendants Feldstein, Desai, and Kociuk copied and took AMD's confidential, proprietary, and/or trade secret information, without AMD's knowledge or approval.

197.    Defendants Feldstein, Desai, and Kociuk, therefore, violated their duty of loyalty to AMD.

198.    As a direct and proximate result of the foregoing wrongful conduct of Feldstein, Desai, and Kociuk, AMD has suffered and will continue to suffer direct and consequential damages.

199.    As a direct and proximate result of the foregoing wrongful conduct of Feldstein, Desai, and Kociuk, AMD has suffered and will continue to suffer irreparable harm that cannot be adequately redressed at law.  Unless injunctive relief is granted, AMD will be irreparably harmed in a manner not fully compensable by money damages.

## COUNT VI: Breach of Contract
### (Feldstein, Desai, Kociuk, Hagen)

200.    AMD realleges and incorporates by reference the foregoing paragraphs.

201.    The Advanced Micro Devices Agreement executed by Defendant Feldstein is a valid, enforceable contract, supported by consideration.  Mr. Feldstein's promises—to return AMD data and records upon the termination of his employment, not to divulge confidential information to unauthorized persons or use such information for unauthorized purposes, not to hire or attempt to hire, directly or indirectly solicit, induce or encourage any AMD employee, to leave to work for another employer—are necessary to protect legitimate business interests of AMD.  These obligations are reasonably limited in time and space, and they are consonant with the public interest.

202.    Mr. Feldstein breached his contract by failing to return AMD data and records upon the termination of his employment; divulging confidential information to unauthorized persons and/or using such information for unauthorized purposes; and/or hiring or attempting to hire, directly or indirectly soliciting, inducing or encouraging AMD employees to leave to work for another employer within one year of the end of his employment with AMD.

203.    The Business Protection Agreement executed by Defendant Desai is a valid, enforceable contract, supported by consideration.  As successor and assignee to ATI Technologies, Inc., AMD is entitled to enforce its rights under the contract.  Ms. Desai's promises—to return documents to the company, not to disclose confidential information to unauthorized persons or use such information for unauthorized purposes, and not to solicit employees for her own benefit or for the benefit of others—are necessary to protect legitimate business interests of AMD.  These obligations are reasonably limited in time and space, and they are consonant with the public interest.

204.    Ms. Desai breached her contract by failing to return documents to the company; disclosing confidential information to unauthorized persons and/or using such information for unauthorized purposes; and/or soliciting employees for her own benefit or for the benefit of others within two years of the end of her employment with AMD.

205.    The Business Protection Agreement executed by Defendant Kociuk is a valid, enforceable contract, supported by consideration.  As successor and assignee to ATI Technologies, Inc., AMD is entitled to enforce its rights under the contract.  Mr. Kociuk's promises—to return documents to the company, not to disclose confidential information to unauthorized persons, and/or not to use such information for unauthorized purposes—are necessary to protect legitimate business interests of AMD.  These obligations are reasonably limited in time and space, and they are consonant with the public interest.

206.    Mr. Kociuk breached his contract by failing to return documents to the company; and/or disclosing confidential information to unauthorized persons and/or using such information for unauthorized purposes.

207.    The Business Protection Agreement executed by Defendant Hagen is a valid, enforceable contract, supported by consideration.  As successor and assignee to ATI Technologies, Inc., AMD is entitled to enforce its rights under the contract.  Mr. Hagen's promise not to solicit employees or assist others to solicit employees is necessary to protect legitimate business interests of AMD.  The obligation is reasonably limited in time and space, and it is consonant with the public interest.

208.    Mr. Hagen breached his contract by soliciting employees or assisting others to solicit employees within two years of the termination of his employment.

209.    As a direct and proximate result of Defendants' breaches of their contracts, AMD has suffered and will continue to suffer direct and consequential damages.

210.    As a direct and proximate result of Defendants' breach of their contracts, AMD has suffered and will continue to suffer irreparable harm that cannot be adequately redressed at law.  Unless injunctive relief is granted, AMD will be irreparably harmed in a manner not fully compensable by money damages.

### COUNT VII: Conspiracy
### (Desai and Kociuk)

211.    AMD realleges and incorporates by reference the foregoing paragraphs.

212.    Defendants Desai and Kociuk conspired with each other to misappropriate AMD's confidential, proprietary, and/or trade secret information; and/or to intentionally access AMD's protected computers, without authorization and/or in a way that exceeded their authorized access, and thereby obtain information from AMD's protected computers; and/or to breach their duties of employee loyalty to AMD.

213.    Defendants Desai and Kociuk acted in concert and in furtherance of a common design or agreement.

214.    Defendant Kociuk provided substantial assistance to Defendant Desai.  He knew that Ms. Desai's conduct in manipulating and/or transferring AMD's confidential, proprietary, and/or trade secret information, described above, constituted a breach of her common-law and statutory duties to AMD.  Defendant Kociuk's assistance was a substantial factor in causing the resulting tort.  Defendant Kociuk had unlawful intent.

215.    Additionally and alternatively, Defendants Desai and Kociuk engaged in a concerted action.  They had a common plan to unlawfully manipulate and/or transfer AMD's confidential, proprietary, and/or trade secret information.  Defendants Desai and Kociuk knew

the common plan and its purpose, and they took affirmative steps to encourage the achievement of the result.

216.    As a direct and proximate result of Defendants Desai and Kociuk's wrongful conduct, AMD has suffered and will continue substantial direct and consequential damages.

217.    As a direct and proximate result of Defendants Desai and Kociuk's wrongful conduct, AMD has suffered and will continue to suffer irreparable harm that cannot be adequately redressed at law.  Unless injunctive relief is granted, AMD will be irreparably harmed in a manner not fully compensable by money damages.

## REQUESTED RELIEF

For the reasons set forth above, Plaintiff Advanced Micro Devices, Inc. respectfully requests the following relief:

1.    Enter an Order granting the relief set forth in AMD's proposed Order attached to its Application for Expedited Ex Parte Temporary Restraining Order;

2.    Enter an Order granting a preliminary injunction to the same effect as the proposed temporary restraining order;

3.    Enter an Order granting a permanent injunction to the same effect as the proposed temporary restraining order;

4.    Enter judgment in favor of AMD and against Defendants on all counts of the Complaint;

5.    Award compensatory damages, calculated at the time of filing to be significantly in excess of the minimum diversity jurisdictional amount;

6.    Award consequential damages in an amount to be proven at trial;

7.      As to Count II, award double damages pursuant to Mass. Gen. Laws Ch. 93, §§ 42, 42A;

8.      As to Count III, award double or treble damages pursuant to Mass. Gen. Laws Ch. 93A, §11;

9.      Award applicable pre-judgment and post-judgment interest;

10.     Award AMD its reasonable and necessary attorneys' fees, pursuant to Massachusetts General Law chapter 93A, Paragraph 11 of Defendant Desai's Business Protection Agreement between Defendant Desai and AMD, Paragraph 10 of Defendant Kociuk's Business Protection Agreement, Paragraph 10 of Defendant Hagen's Business Protection Agreement, and as otherwise provided by law.

11.     Award AMD its costs of suit, and;

12.     Award AMD any such other and further relief as the Court may deem just and proper.

## JURY DEMAND

AMD demands a trial by jury on all issues in this action.

## PRAYER

For the reasons set forth above, AMD prays for a temporary restraining order, a preliminary injunction, and upon trial of the suit, a permanent injunction against Defendants. AMD further prays for actual damages, consequential damages, double or treble damages where allowed by law, costs of suit, and reasonable attorney's fees, together with pre-judgment and post-judgment interest as allowed by law.  AMD also seeks any other and further relief, at law or in equity, to which it may be justly entitled.

DATED:  March 4,  2013

**ROBINS, KAPLAN, MILLER & CIRESI L.L.P.**

By:      /s/ Christopher P. Sullivan

Christopher P. Sullivan, (485120)
Anthony A. Froio, (554708)
Morgia D. Holmes, (681515)

800 Boylston Street
25th Floor, Prudential Tower
Boston, MA  02199-7080
cpsullivan@rkmc.com
aafroio@rkmc.com
mdholmes@rkmc.com
Tel:  617-267-2300
Fax:  617-267-8288

**WEISBART SPRINGER HAYES LLP**

By:      /s/ Sherrard (Butch) Hayes

Sherrard (Butch) Hayes (TX #00784232)
Sara E. Janes, (TX #24056551)
Mia A. Storm (TX #24078121)
Timothy Cleveland (TX#24055318)

212 Lavaca Street, Suite 200
Austin, Texas  78701
shayes@wshllp.com
sjanes@wshllp.com
mstorm@wshllp.com
tcleveland@wshllp.com
Tel:  512-652-5780
Fax:  512-682-2074

**ATTORNEYS FOR PLAINTIFF**
**ADVANCED MICRO DEVICES, INC.**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certified that copies of the First Amended Complaint filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on March 4, 2013.

/s/ Sherrard (Butch) Hayes

_____

Sherrard (Butch) Hayes
WEISBART SPRINGER HAYES, LLP
212 Lavaca Street, Suite 200
Austin, Texas  78701
512-652-5780

35