<pre>
 1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF MASSACHUSETTS
 2

 3

 4   Advanced Micro Devices,  )
     Inc.,                    )
 5              Plaintiff,    )
                              )
 6                            )
     vs.                      )      Case No. 13CV40007-TSH
 7                            )
                              )
 8   Robert Feldstein, Manoo  )
     Desai, Nicolas Kociuk,   )
 9   Richard Hagen and        )
     Deepaksrivats Thirumalai,)
10              Defendants.   )

11

12   BEFORE:  The Honorable Timothy S. Hillman

13

14              Motion for Temporary Restraining Order

15

16

17                              United States District Court
                                Courtroom No. 2
18                              595 Main Street
                                Worcester, Massachusetts
19                              April 4, 2013

20

21

22

23                    Marianne Kusa-Ryll, RDR, CRR
                          Official Court Reporter
24                    United States District Court
                       595 Main Street, Room 514A
                       Worcester, MA 01608-2093
25                    508-929-3399 justicehill@aol.com
                   Mechanical Steno - Transcript by Computer
</pre>

1  APPEARANCES:

2  Robins, Kaplan, Miller & Ciresi, LLP
   Christopher P. Sullivan, Esquire
3  Morgia D. Holmes, Esquire
   800 Boylston Street, 25th Floor
4  Boston, Massachusetts 02199-8001
   On behalf of the Plaintiff

5
   Weisbart Springer Hayes LLP
6  Sherrard (Butch) Hayes, Esquire
   212 Lavaca Street, Suite 200
7  Austin, Texas 78701
   On behalf of the Plaintiff

8
   Morgan, Lewis & Bockius, LLP
9  Todd S. Holbrook, Esquire
   225 Franklin Street, 16th Floor
10 Boston, Massachusetts 02110
   On behalf of the Defendants

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>P R O C E E D I N G S</u>

1
2          (The following proceedings were held in open
3    court before the Honorable Timothy S. Hillman, United
4    States District Judge, United States District Court,
5    District of Massachusetts, at the Donohue Federal
6    Building & United States Courthouse, 595 Main Street,
7    Worcester, Massachusetts, on April 4, 2013.)
8          THE CLERK:  All rise.
9          Court is now open.  You may be seated.
10          Case No. 13-40007, Advanced Micro Devices
11    versus Feldstein.
12          Counsel, please note your appearance for the
13    record.
14          MR. SULLIVAN:  Christopher Sullivan from
15    Robins, Kaplan, Miller & Ceresi and Mr. Butch Hayes, and
16    Morgia Holmes for the plaintiff, AMD.
17          THE COURT:  Good morning, Mr. Sullivan; good
18    morning, Mr. Hayes; Good morning, Ms. Holmes.
19          MR. HOLBROOK:  Good morning, your Honor.
20    Todd Holbrook with Morgan, Lewis & Bockius for the
21    defendants.
22          THE COURT:  Good morning, Mr. Holbrook.
23          MR. HOLBROOK:  Good morning, your Honor.
24          THE COURT:  Just give me one minute here.
25          Mr. Holbrook, let me ask you, let me just

1    start with you just to crystallize where we are here.

2            And do you have the plaintiff's proposed

3    order --

4            MR. HOLBROOK:  I do, your Honor.

5            THE COURT:  -- someplace handy?

6            MR. HOLBROOK:  Yes.

7            THE COURT:  I'm just trying to see if

8    there -- is there agreement on any of the proposals just

9    so I can focus myself?

10            MR. HOLBROOK:  Your Honor, to focus this as

11   much as possible, we don't think a TRO should be entered

12   at all.

13            THE COURT:  Uh-huh.

14            MR. HOLBROOK:  If one is entered, I don't

15   see -- I don't have any particular issue with the

16   particular points in this order.

17            THE COURT:  Okay.  Fair enough.  Thank you.

18   That's helpful.

19            Who is...

20            MR. SULLIVAN:  Mr. Hayes will.

21            THE COURT:  Go ahead, Mr. Hayes.  Let me --

22   let me start with you.

23            MR. HAYES:  Yes, your Honor.  Thank you for

24   the opportunity to talk to you this morning.

25            Just for clarity, what we're asking for is

1    identical.  I took the order from the one that you had

2    issued.  You had tweaked it slightly on the 11th -- I'm

3    sorry -- the 14th of January in the Feldstein in the

4    original cases.  I slightly changed it.  I took that

5    order.  That's the order that you just asked Mr.

6    Holbrook about.

7                    The parameters of the --

8                    THE COURT:  So this is the tweaked order?

9                    MR. HAYES:  This is the tweaked order, and I

10   believe the only change was I had suggested something

11   like "surrender the devices," and your Honor said

12   "preserve."  I think that was the change in the order

13   that I can recall.

14                    The parameters of the temporary restraining

15   order we're seeking right now are this, two categories

16   of concepts:  One, preserve the information at stake,

17   which is incumbent on these folks to begin with and Mr.

18   Thirumalai to begin with; and, two, live up to the

19   letter of the agreement he signed with AMD, nothing

20   more.  I'm not asking for him to be fired from NVIDIA.

21   I'm not asking for him to be transferred at this time.

22   I'm not asking for him to sit out for a period of time.

23   I saw the response last night after I got off the plane,

24   so it was late, and I haven't studied it as much as I'd

25   like to; however, one of the concerns he raises is, I

1    think, is that he may be on an H-1B visa status.  We're

2    not asking for this gentleman to be deported, to lose

3    his job, or for anything that would trigger his right to

4    be in the United States.

5              That's an interesting concept because it

6    actually came up in another case very similar to this

7    one in Massachusetts, which I can talk to, if you would

8    like.  So that's the scope of the TRO.

9              Just to give a little bit of background as

10   to what occurred here, the TRO is designed to stop

11   the -- the use, transfer, dissemination, sharing of what

12   is in writing and what is in Mr. Thirumalai's head.

13   Mr. Feldstein testified at the hearing we had on

14   February 21st, and he again has repeated in his answer

15   now to the lawsuit that he has an exhaustive memory of

16   things that he did.

17             The purpose of all of this is to keep this

18   gentleman, Mr. Thirumalai, from using it, not just the

19   stuff that's in writing, or on the disc, or on his

20   computer, but the stuff that he knows is confidential,

21   and he is in a place now where he could use it, or the

22   guy next to him could use it, or the conversation in the

23   hall could arise in a situation where he could throw

24   something out and say, hmmm, guess what.  This technique

25   I used proved that this process failed, so NVIDIA, a

1    competitor, can benefit from that knowledge alone.

2              So it's what's in writing, and it's also

3    what's in his head.  The what's-in-his-head part seems

4    to be sort of missing from the analysis in all of this.

5    At least in the papers that have been filed by the

6    defendant.

7              So when I initially contacted counsel,

8    opposing counsel, we had determined that Mr. Thirumalai

9    on November 16th, his last day of employment, downloaded

10   and transferred to a thumb drive 14 discrete documents.

11   I was wrong with about that.  There were more than 14.

12   Our analysis didn't get it all.  The 14 original

13   documents that caused us to make the phone call on

14   March 10th to opposing counsel and alert them to this

15   included things entitled -- entitled file path titles,

16   D ram controller specifications, power management

17   architecture, power management specification latest, and

18   memory controller interface.  These may mean nothing to

19   me, but as is in the affidavit of Harry Fair, these are

20   big deals, and the reason they are big deals is because

21   they, in particular these four things that I listed,

22   relate to a chip called the Northbridge chip, which is

23   what Mr. Thirumalai was working on.

24             The Northbridge chip is the flagship chip.

25   This is in Mr. Fair's declaration.  It is the core of

1    what AMD does.  There has been an effort to distinguish

2    what AMD does from NVIDIA.  There is ample evidence both

3    in the affidavit of Mr. Moshkelani and in the affidavit

4    of Mr. Fair that establish this particular stuff is

5    directly competitive.

6                The -- the -- the evidence also shows that

7    in order to get to this particular stuff, he had to go

8    into a password protected wiki area that is internal to

9    AMD.  It wasn't on -- it shouldn't have been on his

10   computer to begin with.  It's stuff he jumped into the

11   guts of the company to get and pulled out on his last

12   day of employment.  That's significant because on his

13   last day of employment he was debriefed by the legal

14   folks.  He was given a sheet of paper, you can't do

15   this.  If you have anything in writing tell your manager

16   please so we can handle it.  I will get to the

17   declaration in a second because what he does to explain

18   that makes no sense to me.

19               The Fair declaration, despite the opposition

20   document, states that the documents at issue here, the

21   ones that we described, the 14, are highly confidential

22   trade secret information.  They are protected.  They are

23   not public.  These would provide -- these particular

24   ones would provide -- provide an unfair advantage if let

25   loose to a competitor; that there is direct competition

1   in the GPU and CPU integration area between these two

2   companies; and very significantly, the files that

3   Mr. Fair looked at on this spreadsheet that identifies

4   the file paths that were taken on the last day directly

5   impact or directly relate to the competition, which

6   these companies engage.  So it -- that's the evidence

7   before the Court.

8           Now, a week after my call on the 10th of

9   March, we receive confirmation, certainly a day after,

10  that Mr. Holbrook's firm represents Mr. Thirumalai.

11  Fair enough.  They were looking into this, which I

12  appreciated; and then a week later, I get a spreadsheet

13  with an enormous amount of data reflected on this thumb

14  drive, shocking to me, I thought we were dealing with 14

15  documents, but in our analysis we only looked at the

16  last day or the -- some fraction of the last day, I

17  suppose, instead of looking back three weeks.

18          Had we looked back three weeks, we would

19  have found that on this thumb drive, if you exclude

20  personal things that were identified as personal, there

21  were 2,140 file paths that we can identify as documents,

22  rather than just program input file paths.  Of the

23  2,140, 1,600 or more were created in October, on

24  October 25th, about three weeks or so before he left

25  NVIDIA.  423 of those were created on November 16th, his

last day.  So when I assumed that we're dealing with 14, that wasn't true.  Apparently, it was 423.

And then the thing that really concerns us at this point is that 1,036 were accessed after he left and when he was with NVIDIA.  You might recall, your Honor, the expert who came in from Boston with Elysium said on a thumb drive access means opened, copied, printer -- printed, transferred.  I expect for Mr. Holbrook to say that that access after he left was an attempt to delete it.  It may be, but all we have at this point is Mr. Thirumalai's statement about that, which I'm not clear about.

In addition to the nonpersonal, or I think subsumed within it, are these Northbridge documents, the crown jewel sort of trade secret stuff.  108 of those exist on this thumb drive.  All of them -- all of them were created on November 16th, his last day.  Again, really, really problematic for AMD.

Seventy of these 108 were accessed after he left.  Again, we know access means certain things on a thumb drive.  We can't know other than that that they were -- you know, that they were permanently deleted or not.  In fact, the declaration of Mr. Thirumalai says, I don't know.  It could be on my home computer.  I'm not sure whether I got it all.

1          Now, to Mr. Thirumalai's declaration, which

2    we -- I received last -- last evening.  He seems to say

3    about six different things that make no sense to me.

4          (1) he thought the electronic data that he

5    took on his thumb drive was not, quote, written.  Why

6    does he say that?  Well, because he points to language

7    about written information in the debriefing form on his

8    last day.  That's outlandish.  Okay.

9          (2) He thought that the debriefing form

10   allowed him to take apparently 2,000 sensitive

11   confidential documents.  I don't know how that

12   conclusion could possibly have been reached.  He thought

13   that they were his, quote, personal documents.  I don't

14   have any idea how that conclusion could have been

15   reached.

16         Apparently, the debriefing on those last

17   days of employment did not dissuade him from taking 108

18   Northbridge files on the very same day.  Now, presumably

19   he either took them before the debriefing and when he

20   was admonished to return everything in writing and

21   didn't, or had the debriefing and then thought he could

22   go out and do the 108 downloads of the Northbridge

23   files, or more, 400 and so.

24         Either way, how do you get away with this

25   given the language of the debriefing form?

1           Relevance.  The relevance is we've tried

2    multiple times to get this guy to do the right thing,

3    and only when we had a court order in place do we

4    actually have some attention being paid to this.

5           Finally -- well, not finally.  His

6    explanation for taking the thousands of documents is

7    that he's not going to use it at NVIDIA, his current

8    employer, but he needed these technical specifications

9    in case two jobs from now he needs to remind himself of

10   what he did.  So he's thinking a couple of jobs out from

11   now or past NVIDIA.  I don't understand that either,

12   considering the massive download.

13          Finally, there's an ambiguous element about

14   whether he has the information still, whether it's still

15   on his home computer, albeit in his lawyer's office, or

16   whether the information is still on the thumb drive.

17   I'm not sure I understand that.  He takes the position

18   that he doesn't have it any more because his agent, his

19   lawyer has it.

20          Now, as long as they remain his lawyer, I

21   suppose, I have no reason to distrust these -- these

22   good lawyers in this regard, but that could change any

23   time as we all -- as we all know.

24          Now, in the analysis of future harm, your

25   Honor, I think you'll hear that -- that, well, you

1    caught us.  We're going to give it all back to you, if

2    we haven't already.  We captured it all, and there's no

3    harm of future use.  That disregards this question of

4    whether he can use what he has recalled in his mind, and

5    it is exactly the same kind of analysis, your Honor,

6    that courts in Massachusetts undertake to determine, for

7    instance, whether or not to issue an injunction keeping

8    someone from violating a noncompetition agreement.  And

9    I'll point specifically to the *Life Image* case, which is

10   a Massachusetts Superior Court case, and obviously has

11   no direct binding effect on this Court, but I find this

12   one in particular --

13            THE COURT:  Well, I do have an affection for

14   Superior -- Massachusetts Superior Court cases, but

15   that's for another discussion.

16            MR. HAYES:  Okay.  In that case, I will feel

17   comfortable with a 45-second description then.  So *Life

18   Image*, this is 29 Mass. L. Rep. 427, and it's a 2011

19   case, and it was a noncompete case.  The executive

20   leaves for a competitor.  He takes his computer content.

21   Basically his -- all of it, goes to a new company that

22   competes.

23            In that case, the judge focused on the

24   inevitability of the disclosure of the information.  Not

25   necessarily disclosure of the electronic information,

1    what was in his head.  And that was the analysis that

2    caused this Court to issue the injunction upholding the

3    noncompetition agreement.  And the Court refused to

4    accept the mea culpa of the defendant saying, oh, I'm

5    sorry.  You got me.  Here it is.  Here, it's all back.

6    I'm not going to do anything.  The judge rejected that.

7    And I would like to point the Court's attention to

8    footnote 4, which I'll read where the court states in

9    response to Mr. Brown, the plaintiff -- or the

10   defendant, claims that these are all materials he

11   downloaded in the usual course of his business,

12   particularly performing automatic backup of his

13   computer.  I don't accept that benign explanation at

14   this point.  He claims that he didn't intend to delete

15   -- I'm sorry -- that he intended to delete the *Life

16   Image* material.  I don't accept that self-serving

17   explanation either.  Mr. Brown indicated to *Life Image*

18   in a September 17th email that he had confidential

19   material that made no actual effort to return anything

20   until the suit was filed a month later.  This case is --

21   although it's a different -- a different legal theory in

22   terms of the noncompetition agreement is factually very,

23   very similar.

24            So the court in this case enjoins this

25   gentleman based on that and -- and, frankly, points out

1    that the injunction is -- relies in part on the fact

2    that there has been no discovery, material discovery at

3    that point, and -- and the fact that -- and the fact

4    that, frankly, in that case there had been at that stage

5    of the game no actual evidence of, quote, disclosure,

6    but the case was early.  It didn't dissuade the judge

7    from issuing an injunction keeping this guy from working

8    for the competitor.  A much harsher restraint than we

9    are seeking in this case now.

10                THE COURT:  What was the -- give me the cite

11   again on the --

12                MR. HAYES:  Sure.

13                THE COURT:  -- Superior Court case, please.

14                MR. HAYES:  Okay.  It is 29 Mass. L. Rep.

15   427.  I have Lexis 2011, Mass. Super., Lexis 338.  It's

16   by Judge McIntyre, December 22nd, 2011.

17                THE COURT:  What -- is it in your materials?

18                MR. HAYES:  Ah...

19                THE COURT:  I mean the cite?

20                MR. HAYES:  It would not be in the

21   application because we didn't --

22                THE COURT:  Okay.

23                MR. HAYES:  -- but -- but --

24                THE COURT:  I don't recall seeing -- and

25   I -- I didn't give it as careful a reading as I would

```
 1   have liked, but I don't recall seeing it.  But thank
 2   you.  That's -- that's helpful, Mr. Hayes.
 3              MR. HAYES:  In our bench brief, we may have
 4   cited it.  I know I've tried to go back and read as much
 5   of that as I could.  I think it's in a footnote or it's
 6   mentioned in the bench brief, but apologies.
 7              Now, if I can, I think it's important to
 8   talk a little bit about Section 42A, which is this trade
 9   secret misappropriation and injunctive statute.  There's
10   a lot of discussion in the plead -- in the briefing back
11   and forth before the Court, and it relates to the
12   previous preliminary injunction, but also to this, I
13   think.
14              There are two concepts under 42A.  The first
15   one is, for lack of a better phrase, sort of the
16   catchall generalized injunctive relief that can be
17   issued in the event a trade secret is mishandled.  I use
18   that phrase carefully.  And here's -- here's what it
19   says.  An aggrieved person may file a petition in
20   equity, and it has the jurisdictional areas, the Supreme
21   Judicial Court, et cetera, to obtain appropriate
22   injunctive relief, including orders or decrees,
23   restraining and enjoining the respondent from taking,
24   receiving, concealing, assigning, transferring, leasing,
25   pledging, copying, or otherwise using or disposing of a
```

trade secret regardless of value.  Trade secrets defined
as it is in the statute and very broadly.  I don't know
that there is a real argument here that what we're
talking about is not a trade secret under Massachusetts
definition.  I'm happy to address it if the Court needs
me to.

The second provision and the one that the
defendants seem to focus heavily on is one that is, I
think, maybe misread, and it states this: Where an
employer brings an action against a former employer --
employee under the provision of the section for
conversion of a trade secret, and where such conversion
is in violation of the terms of a written agreement
between them, the employer shall upon petition be
granted a preliminary injunction, if it is shown that
the employee is working in a directly competitive
capacity, which by the way they apparently deny, but we
don't, with his former employer in violation of the
terms of such agreement, and that in violation of the
terms of such agreement said employee has used the trade
secret in such competition.

Okay.  I read this as a shall.  If these
things are met, the Court shall issue an injunction.  It
says nothing about -- this provision says nothing about
the first provision, which I think in using this court,

1   the discretion to look at the whole situation and make a

2   common-sense decision about whether these folks'

3   explanations are credible, whether the conduct that they

4   have engaged in might be relevant to what they might do

5   in the future unless the court steps in and says, look,

6   walk the line, even minimally in this TRO, even in the

7   least intrusive way, that first provision gives this

8   Court discretion to do what it wants.  And despite all

9   the flurry of cases that go back and forth, not a single

10  one, not a single one limits this Court's ability to

11  make a judgment call based on the credibility and the

12  circumstances presented and say, look, minimally, you

13  all follow the contract and preserve your stuff.

14  There's not error in that in any way, if you look at

15  what's presented both in the credibility of their

16  explanation and the events that they conceded partaking

17  in, and the idea that Feldstein in particular and in

18  their -- in the hearing and in the -- in their answer

19  concedes, I have a vast knowledge of everything in my

20  head.  That's as important as what's in writing on the

21  thumb drive.

22          Yeah, my -- my co-counsel points out too the

23  second portion that I've mentioned about the mandatory

24  provision of 42A, the shall language, it is, I think,

25  easily read to understand that in the context of a

1   noncompete, that language is -- is what applies.  It may

2   very well be that the legislature intended that to apply

3   in a noncompete scenario, as opposed to the one that

4   we're dealing with before an injunction is issued

5   keeping someone from working.

6           There is no case out there in the flurry

7   that is before the Court that states that if you're

8   caught and you promise to give stuff back, you can't get

9   an injunction as a plaintiff.  Okay.  You catch a

10  defendant and they say, oh, sorry.  Here it is back.

11  There's not a single case that says the court is without

12  authority to enjoin that conduct going forward

13  considering that the information is both in writing and

14  in their minds.

15          I'll leave the Court with one or two more

16  thoughts.  Likelihood of success on the merits, there

17  doesn't seem to be much attention paid to the idea that

18  the contracts at issue in this case are obviously

19  breached.  He breached his agreement.  The likelihood of

20  success, even if it's affirmative summary judgment

21  or -- or a matter of law, he did something he shouldn't

22  have done under his contract is not just a likelihood.

23  I would assume it is almost a certainty at this point.

24  I think that these folks have virtually admitted.  They

25  say, oh, well, I'm not going to do it in the future,

1    there is no harm, but a contract was actually breached

2    here.  And your Honor is entitled to look at that and

3    say likelihood of success on at least that claim.

4    There's all kinds of arguments about whether the

5    Computer Fraud and Abuse Act applies in Massachusetts

6    versus New Hampshire and some differences in the way the

7    cases and the courts approach those, but you don't even

8    need to get there for purposes of issuing this

9    injunction.  I think you can get there with the trade

10   secret and theft statute as well, but this isn't a

11   simple middle ground.

12              I mean I will address one more thing.  I

13   have heard many times that this is all about sending a

14   message.  This is all about getting media attention and

15   ruining these people.  That is not the situation.  Your

16   Honor, if I wanted to attract more media attention to

17   this case and cause more harm to the defendants and to

18   Mr. Thirumalai, I would have filed a separate lawsuit in

19   state court or in federal court where the CNS reports

20   automatically track new filings, not preliminary

21   injunction hearings, or anything else that occurs.  I

22   amended the pleadings in the existing case.  A new case

23   would have triggered another round of media attention,

24   which apparently stopped in January of this year.

25              So, I would like to point that out to the

1  court that this is not a witch hunt.  It is not a

2  malicious effort.  It is a minimally intrusive effort to

3  try to protect the stuff that we need to protect in the

4  face of people who have come up with explanations that I

5  cannot digest.

6          Thank you.

7          THE COURT:  Mr. Holbrook.

8          MR. HOLBROOK:  Good morning, your Honor.

9          THE COURT:  Good morning.

10          MR. HOLBROOK:  First, I would like to get

11  into some background of what Mr. Thirumalai does.

12          THE COURT:  Okay.

13          MR. HOLBROOK:  He has set forth in his

14  declaration he is someone who writes, who looks at what

15  a block, one small discrete piece of a computer chip is

16  supposed to do with data input into it, and what is

17  supposed to come out based on that data.  He looks at

18  what it's supposed to do, writes a program in a -- like

19  C++, or something like that, a computer program to

20  actually do that with particular data, and then runs

21  sample data through that and through the design that

22  someone else has come up with for that actual block to

23  compare the two.  And that's called verification.  It's

24  to verify that the actual physical block does what it's

25  designed to do.

1          So he just writes this program, and every

2    single time he has a new block to look at, he has to

3    write a new program.  It's as simple as that.  It's --

4    it's the -- that's what he does is he looks at what the

5    specification says it's supposed to do, writes a program

6    to do that and compares it with what other engineers

7    have actually designed for that block of the chip to

8    make sure that that design does what it's supposed to

9    do.

10          It's a very low-level job, and it -- this

11   is -- this is, you know, the blocks are -- the discrete

12   elements that you put a whole bunch of them together,

13   they make a computer chip, but he's only looking at a

14   single block at a time; and every single time he is

15   looking at a block, he has to write a new program.

16   Otherwise, there would be no need for a person like him

17   to work.  If you had something that automatically did

18   that, you wouldn't need someone in that position, but

19   that's what he does is that verification.

20          Because every single block requires a new

21   program, nothing that he has done at AMD carries over to

22   NVIDIA.  Nothing that he had can be used in his work at

23   NVIDIA.

24          What he was trying to do though was he has

25   been in the U.S. since his master's about -- well, he

1    studied here for his master's.  He went back to India

2    for a short time, and then he came here, and he has had

3    two jobs up until the time he left AMD.  He worked for

4    Intel for a year and a half, two years, and then he was

5    at AMD for six -- six and a half years.

6              What he wanted to do was he wanted to make

7    sure that he had some ability when he -- if in the

8    future he went for a job interview somewhere else to be

9    able to say these are the types of blocks that I have

10   worked on over the years.

11             Now, should he have taken the AMD data to do

12   that?  Obviously, not.  But he did not understand that.

13   He did understand from the exit interview that any

14   written materials, that's what it says, if you have in

15   your possession any written materials, which my desk

16   here is covered with at the moment, that those had to

17   be --

18             THE COURT:  It sounds like one of those

19   disingenuous oppositions I get on electronic discovery

20   disputes, but anyway, go ahead.

21             MR. HOLBROOK:  Well, your Honor, this is

22   someone who -- trust me -- communicating with Mr.

23   Thirumalai because of the fact that he is Indian and

24   they speak differently, it's an interesting process, as

25   you'll probably hear in God knows how many weeks when we

1  have the preliminary injunction hearing.  But that's

2  what he does.  He is an Indian native.  He is here on a

3  work visa, as you've already heard.  He really did not

4  understand that he could not keep the electronic

5  versions of what he had so long as he maintained them

6  confidential.  The same document says, your obligation

7  to the company with respect to information of the kind

8  described above whether disclosed to you, or acquired by

9  you in the course of your employment at the company is

10 to retain this information in confidence.  He did that.

11 He was going to do that.  It was not until the lawsuit

12 was filed and publicized to everyone inside AMD, and it

13 became public knowledge at NVIDIA at the same time, that

14 he realized that the electronic data that he had was

15 problematic, to say the least; and at that time, he went

16 about trying to delete it all.  He believed at the time

17 that he had.  He then -- some weeks later, he wasn't

18 sure exactly when, he tried to do it again just to be

19 safe, and he did find a couple more things.  That's why

20 he is -- his -- his declaration is worded the way it is.

21 He believed he got everything the first time, but when

22 he went and searched the second time he found some more

23 AMD information, and he deleted it then.  He's not

24 comfortable saying to exactitude that everything has

25 been deleted.  Everything has, however, been turned over

1  to us.  We've already imaged the thumb drive in his home

2  computer, and we're prepared to share that with Elysium

3  for analysis as soon as possible.

4        But AMD has said repeatedly, they gave him a

5  chance.  They gave him a chance to turn the stuff back.

6  They didn't give him a chance.  What we had said when

7  Mr. Hayes contacted us about Mr. Thirumalai, and we

8  looked at his data, we said we will delete that

9  information for you.  That wasn't good enough.  So to

10  say they gave him a chance is disingenuous.  They didn't

11  give him a chance.  He was happy to do that.  He

12  attempted to do it beforehand.

13        Your Honor, turning to the four points that

14  are required for -- for injunctive relief.  You've heard

15  all this with the other defendants so I will be brief,

16  although I'm going to focus on the debriefing memo again

17  in a moment.  There hasn't been any use.  And he, in

18  fact, attempted to delete this information before the

19  lawsuit was ever filed.

20        As to trade secrets, although Mr. Hayes says

21  there's no real contest that this is trade secret

22  information, we -- we've put AMD to their proof on that,

23  and I would point the Court, as we did in our filing to

24  paragraphs 9 and 10 of Mr. Fair's affidavit in which he

25  said he looked at files with file names identical to or

1    closely matching the names of the 14 files.  And he said

2    based on path names, the contents appeared to be highly

3    confidential.  I just don't think that's sufficient

4    proof for injunctive relief.

5              As to unfair competition, again, there

6    hasn't been any use, and Mr. Thirumalai is certainly not

7    in competition with AMD.  We've discussed before how the

8    computer -- the CFA, the computer abuse and fraud act,

9    and the Massachusetts duty of loyalty simply don't

10   apply.  The CFA doesn't apply to situations like this

11   where someone had authorization to access the data at

12   the time they accessed it, and the allegation is

13   misappropriation at a later time.  The duty of loyalty

14   doesn't attach here because Mr. Thirumalai is not in a

15   position of where that duty -- a high-level position

16   where that duty is created.

17             As to the breach of contract, again,

18   the -- the -- the Advanced Micro Devices agreement,

19   which the plaintiff lays its claim upon, which they

20   submitted as Exhibit A-1 requires return of data and

21   records; however, on the day that he left the company,

22   he was given another document which was signed both by

23   him and AMD's representative that said your obligation

24   is to maintain information in confidence and give us

25   back written materials.

1          Now, whether or not it's -- the Court

2    ultimately decides that written materials means

3    something more than on paper, that was his understanding

4    at the time.  And given that this document was drafted

5    by AMD, it should be interpreted against AMD in that

6    regard.

7          As to the equities, again, Mr. Hayes says

8    that AMD attempted to give him a chance to correct all

9    of this.  They didn't.  We offered, and they refused.

10   They've added him to the lawsuit.  He did attempt to

11   delete this information on multiple times.

12         And finally, the public interest, Mr. Hayes

13   said they're not on a witch hunt.  They're not on a

14   publicity campaign.  Our focus, your Honor, is saying

15   that the publicity campaign that they're doing is

16   internal to AMD.  We're not saying that they're trying

17   to get the whole world against these defendants.  What

18   they are doing is they're trying to convince their

19   employees not to leave, and they're using our defendants

20   and Mr. Thirumalai to get that message across, and we

21   don't think the Court should participate in that

22   venture.

23         Thank you, your Honor.

24         THE COURT:  Okay.  What I need you to do is

25   while you're all together is chat with Mr. Castles about

1    a date for the PI hearing, whether I issue the TRO or

2    not.  I'm going to do something by the end of the day, I

3    think.  I just want to read the latest file.  I have not

4    read all of the submission that you made overnight.

5              So get with Mr. Castles, see if you guys can

6    agree on a date for that, and we will see you soon.

7              Thank you.

8              MR. SULLIVAN:  Thank you, your Honor.

9              MR. HAYES:  Thank you, your Honor.

10             MR. HOLBROOK:  Thank you, your Honor.

11             Your Honor, I may have trouble agreeing to

12   the date only in that Melinda Riechert will certainly

13   want to be here, and she is out of the office with her

14   daughter's wedding on Saturday right now.

15             THE COURT:  Okay.

16             MR. HOLBROOK:  What we can do is

17   preliminarily agree on something that works for us and

18   tell her the Court really wants her to be here on that

19   date.

20             THE COURT:  Well, yeah, we can -- it's -- it

21   hasn't been our schedule as much as yours that has kind

22   of tangled this up so do your best here.

23             MR. HOLBROOK:  Thank you, your Honor.

24             THE COURT:  Thank you.

25             (At 10:38 a.m., Court was adjourned.)

1                    C E R T I F I C A T E

2

3          I, Marianne Kusa-Ryll, RDR, CRR, do hereby

4    certify that the foregoing transcript, consisting of 28

5    pages inclusive, is a true and accurate transcription of

6    my stenographic notes in Case No. 13cv40007-TSH,

7    Advanced Micro Devices, Inc. versus Robert Feldstein,

8    Manoo Desai, Nicolas Kociuk, Richard Hagen and

9    Deepaksrivats Thirumalai, before the Honorable

10   Timothy S. Hillman on April 4, 2013, to the best of my

11   skill, knowledge, and ability.

12

13

14   /s/ Marianne Kusa-Ryll                4/29/13

15   Marianne Kusa-Ryll, RDR, CRR          Date

16   Official Court Reporter

17

18

19

20

21

22

23

24

25